IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

DANNY A. CROMEANS                                                    PETITIONER
ADC #107662

V.                                          NO. 5:04CV00059 JWC

LARRY NORRIS, Director,                                             RESPONDENT
Arkansas Department of Correction


MEMORANDUM OPINION AND ORDER

Danny A. Cromeans, an Arkansas Department of Correction inmate, brings this
petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (docket entry #2), along
with a number of amendments and supporting briefs, pleadings and exhibits (docket
entries #9, #11, #13-#25, #27, #29, #31, #33-#38, #43-#48, #52-#60).  Respondent has
filed a response and other supplemental pleadings (docket entries #8, #30, #32, #42, #51).
Because Petitioner's claims are procedurally barred or without merit, the petition, as
amended, will be **dismissed**.[1]


I.
Background

Following a jury trial in July 2002 in the Circuit Court of Lafayette County, Arkansas,
Petitioner was convicted of rape and kidnapping and was sentenced to life imprisonment.
(Resp't Ex. A.)[2]  At the trial,[3] the victim testified that, during the early morning hours of

---

[1]The parties have consented to the jurisdiction of the Magistrate Judge (docket entry #12).

[2]Respondent's exhibits, unless otherwise indicated, are attached to docket entry #8.

[3]The record of Petitioner's state court proceedings, including the trial transcript, was submitted at the
direction of the Court as Resp't Ex. K to docket entry #28.  All transcript references are to this exhibit.

December 18, 2000, Petitioner knocked on her door and told her that he was a friend of Johnny Saunders, that Saunders had been in a car wreck just down the road, and that Saunders had asked him to come to the victim's house for help.  After making some phone calls, Petitioner left.  The victim testified that, a short time later, she was awakened by Petitioner "knocking very aggressively" on her door.  This time, he had a shotgun, told her he was a cop, grabbed her by the hair, and pulled her outside to his truck.  The victim testified that Petitioner drove her around for several hours, raped her twice, repeatedly threatened to kill her, and assaulted her.  She finally persuaded him to take her home.  She then went to her mother's house, where the police were contacted.  Petitioner was arrested later that day based on information from a business card that the victim said she took from the dashboard of his truck.  (Tr. 611- 37.)  State crime lab experts testified that a pubic hair found on the victim's underwear was microscopically similar to Petitioner's hair, that DNA extracted from semen on the victim's underwear matched Petitioner's DNA, and that the probability of selecting an individual at random from the Caucasian population with the same genetic markers identified on the underwear was approximately one in three billion.  (Tr. 495-547.)  Two inmates, James Davis Bridges and Elwyn Graham, testified that, while they were incarcerated with Petitioner, he told them about raping the victim.   (Tr. 551-99.)  Also testifying for the state were Saunders, the victim's mother, various law enforcement officers, and a man who helped Petitioner and the victim on the night in question, when Petitioner's truck was stuck at the end of a rural road.  (Tr. 387-438, 440-52, 473-93, 600-02.)

In a direct appeal to the Arkansas Supreme Court, Petitioner's attorney filed a no-merit brief pursuant to Anders v. California, 386 U.S. 738 (1967), addressing fourteen

2

adverse rulings.  (Resp't Ex. B.)  Petitioner filed a supplemental pro se brief, arguing: (1) he was denied discovery of a business card, (2) he was denied a fair and impartial trial due to references to him as a "skinhead," and (3) the state failed to meet its burden of proof for rape because it did not prove force and penetration and because all the state's testimony was hearsay.  (Resp't Ex. C.)  Finding no error, the Arkansas Supreme Court affirmed his convictions in an unpublished opinion.  Cromeans v. State, No. 02-1186, 2003 WL 21040217 (Ark. Sup. Ct. May 8, 2003) (Resp't Ex. G).

While his appeal was pending, Petitioner filed two almost identical petitions for state post-conviction relief pursuant to Ark. R. Crim. P. 37.  (Resp't Ex. D, E.)  His petitions were denied summarily as without merit.  State v. Cromeans, No. CR-2001-01-1 (Lafayette Co. Cir. Ct.  May 19, 2003) (Resp't Ex. H, I).  Petitioner did not appeal and sought no further post-conviction relief in state court.  (See Resp't Ex. J.)[4]

Petitioner then filed this federal habeas petition, followed by numerous amendments and supporting briefs.  Liberally construing his various interrelated arguments, he advances the following claims:

    1.    He was denied his constitutional right to the effective assistance of counsel because his trial attorney:

    (a)  failed to object when Petitioner was referred to as a "skinhead" (docket entries #2, #22);

    (b) actively represented conflicting interests because many of the trial participants were related (docket entries #9, #33);

---

[4] The docket sheet from Petitioner's criminal case (Resp't Ex. J) shows the filing, on June 4, 2003, of a "'Motion' Rule 37 Appeal to the Supreme Court."  No contention is made that this pleading complied with the applicable procedural rules for properly initiating an appeal from the circuit court decision.

(c)  failed to prepare properly for trial and learn of readily available facts which could have supported a defense, failed to investigate or interview any of the state witnesses or the victim, and failed to notify Petitioner that inmates Bridges and Graham would be testifying (docket entries #9, #11, #29, #55);

(d)  failed to properly challenge the sufficiency of the evidence (docket entry #9);

(e)  failed to object to the admission of hearsay statements from the inmate witnesses (docket entries #22, #29);

2.     The prosecutor engaged in misconduct, violating Petitioner's due process rights, by:

(a)  failing to disclose a business card during discovery (docket entries #2, #22);

(b)  presenting testimony from inmate witnesses Graham and Bridges, which the prosecutor should have known was false or perjured (docket entries #2, #15, #19, #22, #23, #48);

(c)  failing to disclose favorable evidence to Petitioner (that the inmate witnesses were lying and that many of the trial participants were related) (docket entries #9, #18, #19, #23, #33, #48);

3.     He was denied the right to effective assistance of counsel in his direct appeal (docket entries #2, #9);

4.     The trial court erred in denying his motion to suppress the statement of inmate witness Graham (docket entry #9);

5.     The trial court erred in allowing hearsay statements by the inmate witnesses into evidence (docket entry #29);

6.     He was denied a fair trial due to references to him as a "skinhead" (docket entry #22);

7.     There was insufficient evidence to support his rape conviction (docket entries #22, #29, #37, #44, #53, #57);

8.     A "conflict of interest" existed because the victim was related to the jury foreman, the judge, the deputy prosecuting attorney, defense counsel, the arresting officer, and key state witness Graham (docket entries #16, #21, #25, #33, #34, #35, #37, #38, #44, #46, #52, #54, #57, #58), and, as a result

4

(a)  the jury foreman withheld prior knowledge of the case during jury selection, convinced the other jurors to convict Petitioner on insufficient evidence, and was seen talking to the victim's stepfather before Petitioner's trial;

(b)  the trial judge denied Petitioner's motion for directed verdict of acquittal;

(c) Petitioner's due process right to a fair trial was violated;

9.    State witness Johnny Saunders changed his testimony after the prosecutor agreed to drop a drug charge (docket entries #36, #44); and

10.    The sentence imposed constitutes cruel and unusual punishment in violation of the Eighth Amendment due to the multiple constitutional violations (docket entries #19, #22 #37).


II.
Procedural Default

Respondent contends that most of Petitioner's claims are procedurally defaulted because Petitioner failed to properly present them to the state courts.[5]

Before seeking federal habeas review, a state prisoner must first fairly present the substance of each claim to each appropriate state court, thereby alerting those courts to the federal nature of his claims and giving them an opportunity to pass upon and correct any constitutional errors made there.  Baldwin v. Reese, 541 U.S. 27, 29 (2004); see 28 U.S.C. § 2254(b) & (c) (requiring federal habeas petitioner to pursue all remedies available in the state courts).  To preserve a claim for relief, a petitioner "must present both the

_____

[5]Respondent also asserts that the claims raised in Petitioner's various amendments are barred by the one-year statute of limitations for bringing federal habeas claims. See 28 U.S.C. § 2244(d).  Because the statute of limitations defense is not jurisdictional, the Court will proceed to Respondent's alternative procedural-default argument in the interest of judicial economy.  See Day v. McDonough, 126 S. Ct. 1675, 1681 (2006); Trussell v. Bowersox, 447 F.3d 588, 590 (8th Cir. 2006), cert. denied, No. 06-6320, 2006 WL 2593029 (U.S. Nov. 13, 2006).

factual and legal premises" of the claim to each appropriate state court and afford those courts "a 'fair opportunity' to review its merits." Moore-El v. Luebbers, 446 F.3d 890, 897 (8th Cir. 2006), pet. for cert. filed, No. 06-6636 (U.S. Sept. 19, 2006).  Where a petitioner fails to follow applicable state procedural rules in raising his claims, the claims are procedurally defaulted.  Id. at 896.  "Out of respect for the finality of state-court judgments, federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted."  House v. Bell, 126 S. Ct. 2064, 2068 (2006).  Failure to appeal the denial of a post-conviction petition to the highest state court also constitutes a procedural default.  Osborne v. Purkett, 411 F.3d 911, 919 (8th Cir. 2005), cert. denied, 126 S. Ct. 1569 (2006).

The Court agrees that most of Petitioner's claims are procedurally defaulted because (1) he failed to raise them in his direct appeal or his Rule 37 post-conviction petition, or (2) if raised in his Rule 37 petition, he failed to appeal the Rule 37 denial, thus depriving the state's highest court of the opportunity to review them.[6]  Additionally, two of his claims, Ground 2(a) (denial of discovery of business card) and Ground 6 (trial court error in allowing "skinhead" references), were raised in his direct appeal, but the Arkansas Supreme Court was unable to review them because they had not been preserved for appeal with an objection at the trial court level.  Cromeans, supra at *8.

Where a procedural default has occurred, federal habeas review is permitted only if the petitioner can demonstrate (1) cause for the default and actual prejudice as a result

---

[6]Under Arkansas' post-conviction rules, while a direct appeal is pending, "no proceedings under this rule [Rule 37] shall be entertained by the circuit court."  Ark. R. Crim. P. 37.2(a).  Although Petitioner filed his Rule 37 petitions before his direct appeal was decided, the circuit court addressed the merits rather than dismissing the petitions as premature.  Respondent has not argued prematurity as a basis for default.

of the alleged violation of federal law, or (2) that failure to consider the claims will result in a fundamental miscarriage of justice, that is, that a constitutional violation has resulted in the conviction and continued incarceration of one who is actually innocent.  Coleman v. Thompson, 501 U.S. 722, 750 (1991); Murray v. Carrier, 477 U.S. 478, 496 (1986).

Cause requires a showing of some impediment, external to the defense, preventing a petitioner from presenting or developing the factual or legal basis of a claim.  Murray, 477 U.S. at 488-89, 492.  To demonstrate prejudice, a petitioner must show, "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  United States v. Frady, 456 U.S. 152, 170 (1982); Nims v. Ault, 251 F.3d 698, 702 (8th Cir. 2001).

As cause, Petitioner contends that his counsel was ineffective at trial and in his direct appeal.  He says he did not appeal his Rule 37 denial because he did not have the knowledge or proper assistance.  He also says he was unable to raise many of his defaulted claims in his state court proceedings because he did not learn of the underlying facts until after the conclusion of his direct appeal and Rule 37 proceedings.  He also asserts that his default should be excused because he is actually innocent.

A petitioner's pro se status, lack of education, below-average intelligence, or any unfamiliarity with the intricacies of the law or legal procedure are not sufficiently *external* to constitute cause excusing a procedural default.  Sherron v. Norris, 69 F.3d 285, 289 (8th Cir. 1995); Cornman v. Armontrout, 959 F.2d 727, 729 (8th Cir. 1992); Smittie v. Lockhart, 843 F.2d 295, 298 (8th Cir. 1988).

7

Ineffective assistance of trial or appellate counsel may constitute cause to lift a procedural bar. <u>Murray</u>, 477 U.S. at 488. However, a habeas petitioner cannot rely upon ineffectiveness of counsel as cause to excuse a procedural default where he has not properly presented that ineffectiveness claim to the state courts. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 453 (2000) (ineffective assistance of counsel asserted as cause for procedural default of another federal claim can itself be procedurally defaulted); <u>Watts v. Norris</u>, 356 F.3d 937, 941 (8th Cir.), <u>cert. denied</u>, 543 U.S. 904 (2004). While Petitioner raised some ineffective-assistance claims in his Rule 37 petitions, he did not appeal the denial of those claims, thereby defaulting them. Moreover, because there is no constitutional entitlement to counsel in state post-conviction proceedings, the fact that he was proceeding without counsel in his Rule 37 proceedings cannot constitute cause excusing any default that occurred there. <u>Coleman</u>, 501 U.S. at 752, 757; <u>Armstrong v. Iowa</u>, 418 F.3d 924, 927 (8th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1351 (2006).

Therefore, Petitioner's lack of legal knowledge, any inadequacies of his trial and appellate attorneys, and his lack of a post-conviction attorney, cannot constitute sufficient cause.

An external impediment meeting the cause requirement can be "the reasonable unavailability of the factual basis for the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497 (1991); <u>Nims</u>, 251 F.3d at 702. Moreover, the "actual innocence" exception to the cause-prejudice requirement permits federal habeas review where a habeas petitioner presents "new reliable evidence" and shows, in light of the new evidence, "that it is more likely than not that 'no reasonable juror' would have convicted him." <u>Schlup v. Delo</u>, 513 U.S. 298, 324, 329 (1995).

Petitioner relies on the following "new" evidence: (1) affidavits by two state witnesses, James Davis Bridges and Elwyn Graham, asserting that they lied at Petitioner's trial, and (2) the existence of family relationships between many of the trial participants.

A.    Bridges' Recantation.

Bridges testified at Petitioner's trial that, while they were housed in the same correctional facility, Petitioner bragged about going to a house to try to make a phone call, leaving and coming back later with a shotgun, taking the victim out of the house at gunpoint, driving around with her for a while, then forcing her to have sex with him.  He said Petitioner identified the victim as Sara Scott.  Bridges said that his cellmate, Graham, knew the victim's family and that they both wrote letters to the family after they found out who the victim was.  He said no promises or threats had been made that compelled him to testify. (Tr. 551-60.)

In this federal habeas action, Petitioner submits a sworn affidavit from Bridges, dated April 15, 2004.  (Pet'r Ex. B to docket entry #11.)[7]  In the affidavit, Bridges says he was told before Petitioner's trial that Petitioner had raped Sara Scott, who was Graham's cousin.  He says that Graham asked him to help his family by copying some letters and testifying against Petitioner, and that Graham said Bridges would receive some money later for his help.  In the affidavit, Bridges says Graham had obtained Petitioner's case file on the pretense of helping him but that Graham actually intended to testify against Petitioner.  Bridges says Graham later said he and his relatives had "lied about everything" to get Petitioner convicted.  Bridges also says that Petitioner was supposed to have

---

[7]The affidavit also appears at docket entry #13.

testified against Graham in a capital murder trial.  Bridges says he "committed perjury" in his testimony against Petitioner because Graham had tricked him and he did not know the whole story.  Bridges says Petitioner never admitted any rape to him but said he had dated Sara Scott at one time.[8]

Bridges' affidavit does not provide a basis for overcoming Petitioner's procedural default for several reasons.

Where a habeas petitioner has access to the information necessary to make his claim in state court, the failure to develop the claim will not constitute cause.  Nims, 251 F.3d at 702.  Although Bridges' affidavit itself may have been unavailable until April 2004, the underlying factual basis – that Bridges and Graham lied at trial – would have been known to Petitioner at the time of their testimony, at the time of Petitioner's direct appeal, and at the time of his post-conviction proceedings.  In cross-examining Bridges, Petitioner's counsel suggested that Bridges learned about the details of the alleged crime from Graham, who had stolen Petitioner's case file.  Counsel also asked Bridges about his desire to help Graham (his cellmate and friend) and about Graham's desire for revenge against Petitioner.  (Tr. 555-58.)  When Graham testified, Petitioner's counsel cross-examined him about Graham's motive for revenge due to Petitioner's earlier statement against him, some history of fighting and threats between Graham and Petitioner, and Graham's alleged stealing of Petitioner's file.  (Tr. 565-69.)  Even the prosecutor acknowledged the questionable credibility of the inmates' testimony, when he said in closing argument that he debated whether to even have them testify and that it was up to

---

[8]The affidavit also mentions some of the family relationships between the trial participants, which are discussed below.

10

the jurors to decide whether to believe them.  (Tr. 710-11.)  Despite this recognition of credibility issues, Petitioner did not raise any claim in his direct appeal based on allegedly false testimony given by the inmates.  (Resp't Ex. C.)  In his Rule 37 petition, he argued that his trial attorney was ineffective for failing to object to the inmates' testimony as hearsay or to point out that neither of them had anything to lose because they were serving life sentences without parole.  (Resp't Ex. D, at 11.)  However, as stated, he did not appeal the Rule 37 denial.  If Petitioner did not tell Graham and Bridges that he raped the victim, he knew all along that their testimony was false and he could have developed a claim on that basis at the appropriate time in state court.  In fact, Petitioner asserts that, if his attorney had diligently investigated, he could have discovered before trial that the inmates were lying (docket entry #11, at 2).

Furthermore, recantations of testimony generally are viewed with suspicion.  Wadlington v. United States, 428 F.3d 779, 784 (8th Cir. 2005), pet. for cert. filed No. 05-11647 (U.S. June 19, 2006).  Inherent in any recantation is the admission that the witness "either is lying now, was lying then, or lied both times."  United States v. Provost, 969 F.2d 617, 620 (8th Cir. 1992).  Both Bridges and Graham are serving prison terms of life imprisonment without parole and, according to Petitioner, both are known as "jailhouse snitches" due to their "willingness to give false testimony on behalf of the prosecution" (docket entry #57).  While a relevant piece of the state's case against Petitioner, the inmates' testimony was not central to Petitioner's conviction.  The inmates were not witnesses to any of the events surrounding the crime in December 2000, but supposedly

11

were told some of the details by Petitioner some time later in prison.[9]  The only thing that Bridges' current affidavit "recants" is his trial testimony that Petitioner told him about the crime.  Substantial other evidence of Petitioner's guilt was presented at trial through the detailed testimony of the victim and the DNA evidence linking Petitioner to the rape, as well the corroborating testimony of the victim's mother, the police officers, and other witnesses.  As stated, the inmates' testimony was significantly impeached on cross-examination, and the prosecutor even acknowledged the limited relevance and questionable credibility of the inmates' testimony in his closing argument.  Disregarding Bridges' testimony (which the jury may have done anyway), the record still contained ample evidence of Petitioner's guilt.

Therefore, Petitioner has not shown that Bridges' statements in his April 2004 affidavit constitute evidence that was not reasonably available during his state-court proceedings, nor has he shown that he was actually and substantially prejudiced by any false testimony given by Bridges.  The existence of Bridges' affidavit thus does not demonstrate cause or prejudice excusing the default of any related claims.

Moreover, Bridges' affidavit does not show actual innocence.  Even if it is considered new and reliable, Bridges' current "recantation" would only serve as further impeachment of his already diminished credibility, and it does not exonerate Petitioner.  Just because Petitioner may not have told Bridges that he raped and kidnapped the victim does not mean that Petitioner did not commit these crimes.  In light of the other evidence of guilt, Bridges' recantation does not demonstrate a reasonable likelihood that no reasonable juror would have convicted Petitioner of raping and kidnapping the victim.  See

---

[9]Bridges said he did not meet Petitioner until November or December of 2001.  (Tr. 554.)

12

Wadlington, 418 F.3d at 784; Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir.), cert. denied, 126 S. Ct. 93 (2005).

      B.    Graham's Recantation.

      Graham testified at trial that, while they were incarcerated together, Petitioner told him about raping someone that Graham later learned was Sara Scott.  Graham said he knew Ms. Scott because they were from the same community and her father had been one of his teachers in school.  He said that when Petitioner began talking about raping Ms. Scott, he immediately contacted the family and later gave a statement to the police.  On cross-examination, Graham said he had known Petitioner since 1995, when Petitioner had been subpoenaed to testify against him in Graham's capital murder trial.  Graham said he had decided to plead guilty because of Petitioner's anticipated testimony.  He also admitted on cross-examination that they had been in a fight in prison, characterized by Petitioner's counsel as "horrific" but by Graham as "pretty mild," where Graham bit Petitioner's finger. (Tr. 560-599.)

      Here, Petitioner submits a sworn affidavit from Graham, dated April 17, 2006.  (Pet'r Ex. L to docket entry #48.)  In this affidavit, Graham states that, while he was housed at the county jail, the sheriff promised him that, if he would testify against Petitioner, the sheriff would have Graham brought to the county jail to serve his prison sentence as an "Act 309" inmate, or trusty.  Graham says that, in his testimony against Petitioner, he "did not completely tell the truth, as the Sheriff told [him] certain things to say and not to say."  Graham says the sheriff made the same promise to Bridges.

      Like Bridges' affidavit, the reliability of this alleged recantation is suspect.  Graham does not state what parts of his trial testimony were untrue.  His trial testimony was a small

13

part of the evidence against Petitioner, and its credibility was significantly impeached by questions about Graham's motives.  Additionally, Graham's assertions in this affidavit (that he testified against Petitioner based on promises from the sheriff) are inconsistent with those in Bridges' affidavit (that Graham testified against Petitioner out of revenge, either because he was related to the victim or because Petitioner had earlier agreed to testify against Graham), Graham's own testimony at trial (that he testified against Petitioner because he knew the victim's family) and the suggestion on cross-examination (that he testified against Petitioner because of Petitioner's earlier statement and their history of enmity).  The changeable nature of Graham's statements, culminating with his current affidavit, seriously undermines the reliability of *any* of his assertions.

Even more so than with Bridges, Graham's lack of credibility is hardly "new."  Again, if Graham was lying at trial, Petitioner knew this at the time, during his direct appeal, and during his state post-conviction proceedings.  Petitioner had good reasons to distrust Graham, should not have been surprised that Graham would give false testimony against him, and could have raised a claim on that basis at the appropriate time in state court. Also, Petitioner does not say when he first learned that Graham was willing to "recant" his inculpatory trial testimony, and the record contains letters indicating that the two inmates ostensibly have been on good terms for some time.[10]

Even if the specific statements in Graham's current affidavit were unavailable to Petitioner until April 2006, the Court cannot find that any false trial testimony given by

---

[10]The state introduced letters during trial indicating that the two inmates communicated frequently while in prison and that Graham had been helping Petitioner prepare documents and letters since about 1996. (Tr. 570-99, 680-87.)  When asked if they were friends, Graham said, "Basically, yes and no."  (Tr. 566-67.) Additionally, Petitioner has submitted in this proceeding various undated letters that he apparently has received from Graham while in prison.  (See attachments to docket entries #9, #20, #52, #56, #58.)

Graham actually and substantially prejudiced him at trial. The record contained substantial evidence upon which the jury could have found Petitioner guilty without relying on the questionable testimony given by Graham. Furthermore, while Graham's affidavit may be new, it is not reliable and it does not demonstrate Petitioner's factual innocence of the crimes for which he stands convicted.

C.    Family Relationships.

Petitioner also alleges that he has become aware of the following family relationships:[11]

(1)    The victim and "key state witness" Graham are cousins, because Graham's mother is the sister of the father of Max Knight, the victim's stepfather. (i.e., Graham's mother and the victim's step-grandfather are siblings)

(2)    Another cousin to both the victim and Graham is Todd Scott, the arresting officer, who also testified for the state.

(3)    The trial judge (Joe Griffen) is the father of a deputy prosecuting attorney in the case (John Griffen).

(4)    Graham's great-aunt is also the aunt of the trial judge and the deputy prosecutor, making them second or third cousins to both Graham and the victim.

(5)    Graham's great-aunt was a Pickler, which would make him a cousin to Petitioner's court-appointed attorney, Charles Potter.

(6)    The maiden name of the victim's mother, Sara Scott Knight,[12] was either Graham, making her related to inmate Graham, or Griffen, making her related to the judge and deputy prosecutor.

(7)    The jury foreman, Robert L. Knight, is either a cousin or a brother to the victim's stepfather, Max Knight.

---

[11]The allegations are scattered throughout Petitioner's pleadings and exhibits (e.g., docket entries #11, #13, #15, #16, #19, #21, #25, #33-#38, #44-#47, #52, #54, #55, #57, #58).

[12]Adding to the confusion in this case is the fact that the victim (Sara Elizabeth Scott) and her mother (Sara Scott Knight) share the same first name.

15

If true, the extent of these family relationships is remarkable.  However, most of them go to discredit the testimony of Graham, which, as stated above, was not critical to Petitioner's conviction and was already of questionable reliability.  If true, Graham is distantly related to the victim through both her stepfather and her mother.[13]  Graham admitted at trial that he knew the victim and her family and that was the reason he came forward to testify, (Tr. 564-65), or so he said at the time.  Officer Scott testified that he and the victim were cousins, but said their families had a "strained relationship" and rarely saw each other.  He also denied encouraging the victim to report a rape to set up Petitioner. (Tr. 601-02.)   Petitioner provides no proof that Graham is related to the judge, deputy prosecuting attorney or defense counsel, and any such connection would be remote. Therefore, even if the information regarding Graham's alleged family connections was not available to Petitioner earlier, the Court does not believe that they caused actual and substantial prejudice to Petitioner's trial, thus failing to satisfy the cause-prejudice requirement .  Additionally, these alleged relationships do not constitute new and reliable evidence of Petitioner's actual innocence, as they merely serve to further undermine Graham's tarnished credibility.

Of the remaining alleged family connections, the two that are most troubling are the alleged father/son relationship between the judge and a deputy prosecutor, and the alleged cousin/brother relationship between the jury foreman and the victim's stepfather.  The

---

[13]Accepting Petitioner's allegations as true would make inmate Graham a cousin to the victim's stepfather (Max Knight), as alleged in (1) above, and a cousin to the victim's mother (Sara Scott Knight) as alleged in (6) above, leading to the implausible conclusion that Max and Sara Knight are cousins as well as spouses.

Court nevertheless finds that Petitioner's allegations in this regard are insufficient to satisfy either the cause-prejudice or actual-innocence requirement.

First, Petitioner offers no proof of these relationships, other than his bald assertions and various undated, unsworn letters and notes to Petitioner from Graham, who Petitioner says is related to nearly every person who testified at or participated in his trial, including the victim, the judge, a deputy prosecuting attorney, the defense attorney, the arresting officer, and the jury foreman.[14]  If these assertions regarding Graham are accepted, then all of the individuals are also related to each other.  It is significant, however, that none of the alleged relationships are mentioned in the only sworn affidavit from Graham that has been filed in this case, (Pet'r Ex. L to docket entry #48).

Second, this is not "new" evidence.  It was evident even before trial that the judge and deputy prosecuting attorney shared the same last name and, in a small community like Lafayette County, any disqualifying relationship would be common knowledge in legal circles.[15]  (Tr. 140, 148, 153, 156 [pretrial hearings on 6/19/01, 10/02/01, 2/19/02 & 4/16/02].)  At trial, the judge and deputy prosecutor were both introduced by name during voir dire.  (Tr. 219, 276, 329.)  Similarly, it became apparent during voir dire that one of the state's announced witnesses shared the same last name as a prospective juror.  It was announced that one of the witnesses would be Sara Knight, (Tr. 282), before Robert Knight

---

[14]For instance, Petitioner submits an undated, unsworn letter from Graham stating that Max Knight is his cousin and that, "as far as I know, I have a cousin named Robert L. Knight," (docket entry #58), and an undated, unsworn note from Graham saying that "Sara" (presumably the victim) is his cousin (docket entry #52).

[15]The prosecutor commented during a pretrial hearing that Petitioner's attorney was "very competent and capable" and "very knowledgeable of matters here in Lafayette County [and] whether or not people can get fair trials here or not."  (Tr. 202.)

17

was called as a juror.  He was accepted as a juror without questioning by either side.  (Tr. 325-26, 340-41.)  When the victim's mother testified, she identified herself as Sara Scott Knight and mentioned her husband, Max, identifying him as the victim's stepfather.  (Tr. 440, 442.)  A sheriff's deputy also testified that Max Knight was the victim's stepfather.  (Tr. 389.)  When the verdict of guilt was read, the court identified the jury foreperson as Robert Knight, and polled each individual juror by name, including Mr. Knight, as to his or her verdict.   The court then asked if there any questions about the verdict, and Petitioner's attorney responded no.  (Tr. 738-41.)  The court then did the same with the verdict of punishment, identifying the jury foreperson as Robert Knight while reading the verdict form, polling each individual juror by name, including Mr. Knight, and asking the attorneys if there were any questions about the verdict.  (Tr. 756-58.)

The name similarities were not hidden and should have alerted Petitioner to the possibility of potentially prejudicial family relationships.  He made no objection or inquiry at trial, raised no related claim on his direct appeal through counsel[16] or in his pro se brief, and raised no related claim in either of his Rule 37 petitions.  "If what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what he does not know is irrelevant.  Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim."  McCleskey, 499 U.S. at 498.  This evidence was not reasonably unavailable for purposes of establishing cause, nor was it "new" evidence of innocence.  See Osborne,

---

[16]It is noteworthy that, in his direct appeal, Petitioner was represented by a different attorney than during his circuit court proceedings.  The appellate attorney was not from the Lafayette County area and is not alleged to be part of the tangled web of relationships asserted by Petitioner.

411 F.3d at 920 (no "new" evidence where affidavit was based on information existing at time of trial, which could have been discovered earlier if pursued with diligence); Nance v. Norris, 392 F.3d 284, 291 (8th Cir. 2004) (no actual-innocence showing with information that was available at trial, on direct appeal and throughout post-conviction proceedings), cert. denied, 126 S. Ct. 133 (2005); Hall v. Luebbers, 296 F.3d 685, 698 (8th Cir. 2002) (no actual-innocence showing with evidence that was "neither new nor sufficient" under Schlup standard).

Additionally, neither the judge/prosecutor nor victim/juror relationship can be said to demonstrate Petitioner's actual innocence.  While raising questions as to the fairness of the proceedings, the alleged connections do not show that he is factually innocent of the crimes for which he stands convicted, nor do they necessarily undermine the credibility of the evidence against him: the victim's unequivocal testimony, the DNA evidence, and the testimony of corroborating witnesses. See Villafuerte v. Stewart, 142 F.3d 1124, 1126 (9th Cir. 1998) (claims of judicial bias do not "add to or subtract from the evidence of [the defendant's] guilt" and thus have "nothing to do with [the defendant's] actual innocence"); In re Buenoano, 137 F.3d 1445, 1447 (11th Cir. 1998) (evidence that juror should have been disqualified does not establish actual innocence); Knox v. Iowa, 131 F.3d 1278, 1282 (8th Cir. 1997) (merely asserting that trial was unfair because of flawed voir dire and a biased juror is insufficient to use actual-innocence exception where petitioner presents no new evidence of innocence).

In summary, with the exception of Ground 7 discussed below, all of Petitioner's claims are procedurally defaulted, and he has failed to meet the cause-prejudice

requirement or demonstrate actual innocence.   The claims must be dismissed as procedurally barred.

### III.
### Sufficiency of Evidence

The only claim that is not defaulted is Ground 7, alleging that the evidence was insufficient to support Petitioner's rape conviction.   This claim was raised, and rejected, in Petitioner's direct appeal.

In the interests of finality and federalism, a federal habeas court is constrained by statute to exercise only a "limited and deferential review of underlying state court decisions." Whitehead v. Dormire, 340 F.3d 532, 536 (8th Cir. 2003).  Thus, where a state court has previously adjudicated a claim on the merits, a federal habeas court may grant habeas relief for the same claim in only three limited situations: where the state court adjudication (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); **or** (2) "involved an unreasonable application" of clearly established federal law, id.; **or** (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).  In evaluating a state court decision under § 2254(d), a federal habeas court must presume any factual findings made by the state court to be correct unless rebutted by clear and convincing evidence.  Id. § 2254(e)(1).

As interpreted by the United States Supreme Court, the Due Process Clause of the Fourteenth Amendment guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to

convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316 (1979). The evidence presented at a trial is constitutionally insufficient to convict only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324. In making this determination, all of the trial evidence is to be viewed in the light most favorable to the state. Id. at 319. A reviewing court must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state and must defer to that resolution. Id. at 326. It is the responsibility of the trier of fact to reconcile conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Id. at 319. A federal habeas court is not permitted to conduct its own inquiry into witness credibility. Wright v. West, 505 U.S. 277, 296-97 (1992); Robinson v. LaFleur, 225 F.3d 950, 954 (8th Cir. 2000) ("that is a task reserved to the jury").

The substantive elements of state crimes are defined by state law. Jackson, 443 U.S. at 324 n.16. Petitioner was charged with rape pursuant to Ark. Code Ann. § 5-14-103(a)(1) (1997), which criminalizes engaging in sexual intercourse or deviate sexual activity with a victim by forcible compulsion. Under Arkansas law, it is well-established that the testimony of a rape victim, even without any corroboration, is sufficient to support a rape conviction and that inconsistencies in the victim's testimony are for the jury to resolve. Walters v. State, 193 S.W.3d 257, 259 (Ark. 2004); Mills v. State, 95 S.W.3d 796, 800 (Ark. 2003); Williams v. State, 962 S.W.2d 329, 331 (Ark. 1998).

In Petitioner's direct appeal, he argued that the trial evidence was insufficient to prove the necessary elements of force and penetration. The Arkansas Supreme Court stated, "The test for determining the sufficiency of the evidence is whether the verdict is

supported by substantial evidence, direct or circumstantial." <u>Cromeans</u>, <u>supra</u> at *6. Applying this test, the court found that the evidence was sufficient based on the state crime lab's findings regarding hair analysis and DNA testing; the testimony that Petitioner told other inmates specific details about the rape; and the victim's testimony about Petitioner's use of threats and force, as well as her testimony that he penetrated her with his penis and his finger.

This Court has carefully reviewed the transcript of Petitioner's state court trial and has determined that the factual findings made by the Arkansas Supreme Court, and relied upon in reaching its decision, are reasonable in light of the evidence presented at trial. Therefore, the decision was not based on a unreasonable determination of the facts under § 2254(d)(2).

The legal standard applied, while resting on state law, was not contrary to United States Supreme Court law under § 2254(d)(1).  <u>See</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16 (2003) (it is not necessary for the state court to cite, or even be aware of, applicable United States Supreme Court opinions, as long as "neither the reasoning nor the result of the state-court decision contradicts them"); <u>Sera v. Norris</u>, 400 F.3d 538, 543 n.1 (8th Cir.), <u>cert. denied</u>, 126 S. Ct. 283 (2005) (legal standards applied by the Arkansas Supreme Court to assess sufficiency of the evidence are not contrary to United States Supreme Court precedent).  Furthermore, the decision was not an unreasonable application of the principles enunciated in <u>Jackson</u>.

Here, Petitioner asserts that there was no evidence of force and penetration, no sign of a struggle, no wounds or physical injuries, no medical examination or hospital records, and no proof of a weapon.  He says the DNA evidence simply showed that he and the

22

victim had engaged in consensual sex.  He says his conviction was based entirely upon the victim's testimony, and he points to problems with the state's corroborating witnesses (Saunders, Bridges, Graham).  He says that his version of events is supported by the testimony of John C. Bearden, who helped pull Petitioner's truck out of a ditch and said that the victim made no pleas for help.

Contrary to Petitioner's assertions, the record demonstrates that his conviction is supported by more than the rape victim's testimony.  As stated earlier, her testimony that Petitioner raped and assaulted her was confirmed by the testimony of her mother and the police officers.  It was also corroborated by the DNA evidence, as testified to by the state crime lab experts.  This is more than sufficient to support Petitioner's rape conviction, even disregarding the inmates' testimony.  Furthermore, the jury was entitled to credit the victim's testimony that, before they flagged down Mr. Bearden for help, Petitioner threatened to kill her and anyone stopping to help them if she acted suspicious in any way, and she did not want an innocent man dying.  (Tr. 648-49, 653-54.)  See Walters,193 S.W.3d at 259 (evidence was sufficient to support rape conviction, even though there were no signs of a struggle or injury to defendant or victim and the victim's apartment was not in disarray, where victim identified defendant as person who raped her, testified that he told her he would kill her if she screamed and that she was too afraid to fight him off, and DNA evidence linked defendant to crime).

The Arkansas Supreme Court's determination that the evidence was sufficient to support Petitioner's rape conviction was not contrary to, or an unreasonable application of, United States Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the trial record.  Ground 7 must be dismissed as without merit.

23

IV.
Evidentiary Hearing; Appointment of Counsel

Petitioner requests an evidentiary hearing so that he can support his newly discovered evidence by presenting, among other things, testimony from inmates Bridges and Graham.

A federal habeas court's power to conduct an evidentiary hearing is "sharply limited" by statute.  Cox, 398 F.3d at 1030.  Where a habeas petitioner has failed to develop the factual basis of his claims in state court proceedings, the federal court "*shall not*" hold an evidentiary hearing unless the petitioner shows (1) that his claims rely on "a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court," or "a factual predicate that could not have been previously discovered through the exercise of due diligence," *and* (2) that "the facts underlying the claim[s] would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2) (emphasis added).

As explained in discussing his procedurally defaulted claims, Petitioner has not met this stringent standard.  At the time of his state-court proceedings, Petitioner and his attorneys were on notice of the questionable credibility of the inmate witnesses' testimony and the name similarities between several trial participants, yet failed to develop any claim in this regard.  Even if any of his "new" information is considered previously unavailable through the exercise of due diligence, none of it constitutes clear and convincing evidence that, but for constitutional error, no reasonable jury would have found him guilty.  The Court has been able to resolve all of his claims based on the numerous pleadings and exhibits

submitted here.  See Rule 8(a), Rules Governing § 2254 Cases in United States District Courts; Jackson, 443 U.S. at 322 (sufficiency-of-the-evidence claim "can almost always be judged on the written record without need for an evidentiary hearing in the federal court"); Osborne, 411 F.3d at 915-16 (no federal habeas hearing based on affidavit received after termination of state-court proceedings, where petitioner and counsel did not diligently pursue issues in state court); Burton v. Dormire, 295 F.3d 839, 848 (8th Cir. 2002) (no hearing required where record clearly indicates that claims are either barred from review or without merit).

Additionally, the Court does not find that the interests of justice warrant the appointment of counsel in this proceeding.  There is neither a constitutional nor statutory right to counsel in federal habeas proceedings; instead, it is committed to the discretion of the district court.  Morris v. Dormire, 217 F.3d 556, 558-59 (8th Cir. 2000); McCall v. Benson, 114 F.3d 754, 756 (8th Cir. 1997); see also § 2254 Rule 8(c); 18 U.S.C. § 3006A(a)(2) (counsel may be appointed when "the interests of justice so require").  Petitioner has demonstrated that he understands the issues and has been capable of presenting his claims, of submitting many supporting pleadings and exhibits, and of replying to Respondent's arguments for dismissal.  The Court has freely allowed Petitioner to submit amendments and other pleadings, has reviewed every item submitted by him, has liberally construed all of his pro se filings, and has directed the submission of additional materials to ensure that the record is complete.  See Petty v. Card, 195 F.3d 399, 400 (8th Cir. 1999) (pro se habeas petitioner entitled to liberal construction of petition and supplemental pleadings).  Under these circumstances, appointment of counsel is not warranted.

V.

Conclusion

Petitioner's claims are procedurally barred or without merit.  Therefore, this 28 U.S.C. § 2254 petition for writ of habeas corpus, as amended, is hereby **dismissed in its entirety with prejudice**.  His motions for a hearing (docket entries #56, #58) and for appointment of counsel (docket entry #60) are **denied**.

IT IS SO ORDERED this 15th day of November, 2006.


_____
UNITED STATES MAGISTRATE JUDGE